IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| RICHARD K. FOLSOM and JAN L. FOLSOM, individually and as co-administrators of the estate of SETH ELLIS FOLSOM, deceased, <br><br> Plaintiffs, <br><br> vs. <br><br> KAWASAKI MOTORS CORP., U.S.A.; KAWASAKI HEAVY INDUSTRIES, LTD.; KAWASAKI MOTORS MANUFACTURING CORP., USA; JOE HOLLIFIELD; BRADY A. STEVENS; and Z.S., a minor; <br><br> Defendants. | CIVIL ACTION NO. 3:04-CV-42(CDL) |

## COMPLAINT

COME NOW Plaintiffs, complaining of defendants, and show the Court the following:

### Parties and Jurisdiction

1. Plaintiffs Richard K. and Jan L. Folsom, are citizens and residents of Beaufort County, North Carolina; they are husband and wife, and together they were the parents of Seth Ellis Folsom, deceased; they have qualified as co-administrators for the Estate of Seth Ellis Folsom, deceased, in Pitt County Superior Court, North Carolina, File No. 02-E-352.

2. Seth Ellis Folsom was Plaintiffs' eldest son; he was a twin and an older brother; at the time of his death he was 21 years of age, engaged, and in college.

3. Kawasaki Motors Corp, U.S.A. is a corporation, organized and doing business under the laws of Delaware with its principal place of business located in Irvine, California. A notice of lawsuit and request for waiver of service are being sent to this defendant. Should the defendant not waive service, it may be served with process through its registered agent in Georgia, Corporation Process Company, 180 Cherokee Street, Marietta, Georgia 30060.

4. Kawasaki Heavy Industries, Ltd., is an international corporation doing business in the United States of America, with its principal place of business located at World Trade Center Bldg., 4-1 Hamamatsu-cho, 2-chome, Minato-ku, Tokyo 105-6116, Japan. A notice of lawsuit and

request for waiver of service are being sent to this defendant. Should the defendant not waive service, it may be served with process through the United States Department of State.

5. Kawasaki Motors Manufacturing Corp., USA, is a corporation, organized and doing business in the United States with its principal places of business located in Maryville, Missouri, and Lincoln, Nebraska. A notice of lawsuit and request for waiver of service are being sent to this defendant. Should the defendant not waive service, it may be served with process on its registered agent, CT Corporation System, Suite 500, 301 S. 13th Street, Lincoln, Nebraska 68508.

6. Brady A. Stevens, hereinafter referred to as "defendant Stevens," is a resident of Gwinnett County, Georgia. A notice of lawsuit and request for waiver of service are being sent to this defendant. Should the defendant not waive service, he may be served with process at his residence, 4091 South Fork Dr., Snellville, GA 30039.

7. Joe Hollifield, hereinafter referred to as "defendant Hollifield," is a resident of Cherokee County, Georgia. A notice of lawsuit and request for waiver of service are being sent to this defendant. Should the defendant not waive service, he may be served with process at his residence, 528 Bells Ferry Place, Acworth, GA 30102.

8. Z.S., hereinafter referred to as "defendant Z.S.," is a resident of Greenville County, South Carolina. A notice of lawsuit and request for waiver of service are being sent to this defendant. Should the defendant not waive service, he may be served with process at his residence.

9. Defendant Z.S. is a minor. Pursuant to Local Rule 8 of the Middle District of Georgia, his initials are being used in lieu of his name herein, and his other identifying information is being withheld from this pleading.

10. Plaintiffs are informed, believe, and therefore allege that defendant Kawasaki Motors Corp, U.S.A. and Kawasaki Motors Manufacturing Corp., USA are subsidiaries of Kawasaki Heavy Industries, Ltd. Defendants Kawasaki Motors Corp., U.S.A.; Kawasaki Heavy Industries, Ltd.; and Kawasaki Motors Manufacturing Corp., USA, are referred to herein collectively as "the Kawasaki defendants."

11. The Kawasaki defendants design, manufacture, market and distribute personal water craft ("PWC") known as Jet Skis.

12. The Kawasaki defendants designed and manufactured the personal water craft involved in this action, a 1998 Kawasaki 900 STX Jet Ski.

13. The Kawasaki defendants designed and manufactured Jet Skis, including the one involved in the incident at hand, and placed them into the stream of commerce to be purchased and used in Georgia.

14. The Kawasaki defendants marketed themselves in Georgia and had their Jet Skis promoted in Georgia.

15. At least one of the Kawasaki defendants was registered to conduct business in Georgia and had a registered agent in Georgia.

16. The Jet Ski at issue was purchased and used in Georgia.

17. This Court has personal jurisdiction over defendant Kawasaki Motors Corp., U.S.A.

18. This Court has personal jurisdiction over defendant Kawasaki Heavy Industries, Ltd.

19. This Court has personal jurisdiction over defendant Kawasaki Motors Manufacturing Corp., USA.

20. This Court has personal jurisdiction over defendant Hollifield.

21. This Court has personal jurisdiction over defendant Stevens.

22. This Court has personal jurisdiction over defendant Z.S.

23. The United States District Court has diversity jurisdiction over this action. The amount in controversy exceeds $75,000, and is an action between citizens of different States in which a citizen of a foreign state is an additional party. 28 U.S.C. § 1332(a).

24. Venue is proper in the Middle District of Georgia, Athens Division, as a substantial part of the events giving rise to the claim occurred in Hart County, Georgia. 28 U.S.C. §§ 1391(a)(2), 90(b)(1).

**Facts**

25. As manufacturers of personal water crafts have raced to build faster and more powerful machines – and geared their marketing efforts to the young – sales have exploded; unfortunately the number of PWC accidents exploded as well with PWC related deaths rising in the United States from 5 in 1987 to 78 in 1998.

26. Accidents involving PWCs have been a major concern of marine safety enforcement since the early 1980s.

27. Kawasaki introduced the Jet Ski in the United States in 1974.

28. Kawasaki's early Jet Ski models had a 32 horsepower engine and required a user to stand, which required considerable practice and coordination.

29. Modifying their Jet Skis to permit the operator to sit, the Kawasaki defendants reduced the level of skill required to operate their PWCs and made them more accessible to consumers of all ages and levels of experience.

30. As of May 24, 2002, Seth Ellis Folsom had completed his first year of college at Appalachian State University in Boone, North Carolina, where he had met and fallen in love with Kim Shaffert, hereinafter referred to as "Kim;" he was in excellent health with a life expectancy of more than sixty remaining years.

31. On May 24, 2002, at approximately 6 PM, Seth and his fiancée Kim, arrived from Boone, North Carolina at the Milltown Campground at Lake Hartwell, on the Georgia side of the Savannah River and the lake area formed there for a Memorial Day weekend camping event with family and friends.

32. Based upon reservations and coordinated plans, Seth and Kim proceeded to the campsites in Loop 'C,' where Kim's family members and their friends had already begun to set up camp.

33. Seth and Kim set up camp at site #48 within the Milltown Campground. They then went for a brisk swim in the cove and fixed their dinner.

34. Following dinner, Seth and Kim proceeded over to an adjacent campsite where Seth played guitar and entertained several of the campers until around 10 PM, at which time everyone retired.

35. On the morning of May 25, 2002, Seth and Kim woke up around 8 AM; they went to the bath area, brushed their teeth, then returned to their campsite and prepared breakfasts of cereal.

36. Afterwards, Seth and Kim lounged around the campsite, lying in a hammock with Seth playing his guitar.

37. Around noon on May 25, 2002, defendant Hollifield arrived from Acworth, GA.; he had turned 21 the previous day.

38. Defendant Hollifield visited and made introductions at most of the families' campsites, including Seth and Kim's.

39. When defendant Hollifield arrived at defendant Stevens' campsite, #43, located in an adjacent cove, defendant Hollifield asked if he could use defendant Stevens' Kawasaki Jet Ski.

40. Prior to May 25, 2002 defendant Brady Stevens, hereinafter referred to as "defendant Stevens", had purchased the 1998 Kawasaki Jet Ski new from a Kawasaki distributor in the Atlanta, Georgia area.

41. The Kawasaki defendants intended the instant 1998 Kawasaki 900 STX to reach the general public, and the subject Jet Ski did reach the general public without change in condition in which it was designed, manufactured, and sold.

42. At all times relevant hereto, defendant Stevens was the registered owner of the 1998 Kawasaki 900 STX model Jet Ski, VIN KAW04271H798, bearing hull numbers GA 0653 AZ; said 1998 Kawasaki 900 STX Jet Ski was a standard, unmodified from production Personal Water Craft which contained a 2-stroke, 3 cylinder, crankcase reed valve water-cooled engine manufactured by defendant Kawasaki Motors Corp, U.S.A. which produced a jet thrust and employed a steerable nozzle to effect steering; upon information and belief, the Jet Ski weighed more than 600 pounds without a driver and employed a Keihin fuel injection system.

43. The 1998 Kawasaki 900 STX Jet Ski was defective in its design, manufacture, and regular use in that it is devoid of directional control when the throttle is released, commonly referred to "off-throttle" steering.

44. Kawasaki's 1998 900 STX Jet Ski was designed so that water enters through intake valves, after which the water is concentrated, accelerated, and expelled through an output valve at the rear of the craft in similar fashion to an airplane's jet engine's treatment of air.

45. Unlike an airplane, however, the Kawasaki defendants' 900 STX Jet Skis were, at all times relevant hereto, powered and steered by the water jet. There was no rudder, as on a plane or other boats; a movable nozzle directs the thrust of the water jet to control the direction of the vessel.

46. Also, unlike planes and other power boats, the Kawasaki defendants' 900 STX Jet Ski could not reverse thrust for braking purposes.

47. To stop the 900 STX, an operator had either to allow the vessel to coast to a stop or to put it into a controlled spin, a feat which requires skill and practice.

48. Thus, the most dangerous aspect of a 1998 900 STX is its lack of directional control when the throttle is released.

49. When an operator instinctively releases the throttle in an attempt to avoid a collision, the water jet disengages, and the driver's ability to steer is lost.

50. In virtually every other type of vehicle, the operator lets off of the throttle in an emergency: cars, all terrain vehicles, snowmobiles, planes, and power boats all can turn when the driver releases the throttle.

51. The concept of accelerating in the face of danger is counterintuitive to most inexperienced operators.

52. During his introduction rounds on May 25, 2002, defendant Hollifield secured an agreement from defendant Stevens that in exchange for going to buy gas for defendant Stevens' Jet Ski, defendant Hollifield could use defendant Stevens' Jet Ski.

53. Accompanied by his 14 year old cousin, defendant Z.S., defendant Hollifield went to buy gas.

54. When they returned, defendant Hollifield refueled defendant Stevens' Kawasaki Jet Ski and took his 12 year old cousin, N.S., out briefly as a passenger.

55. At approximately 1:00 PM, defendant Hollifield, with N.S. riding on the back, drove in and out, splashing a number of Kim's cousins who were swimming in the adjacent cove where Kim and Seth had set up camp and continued lying in the hammock.

56. Upon information and belief, defendant Hollifield was a relatively experienced Jet Ski operator as he personally owned a 'Stand Up' sport model Sea Doo, but did not bring it to Lake Hartwell because it was in need of repair in May of 2002.

57. Further out in the main lake area, defendant Hollifield again attempted some advanced maneuvers with the Jet Ski, which resulted in throwing his younger cousin off into the chilly water.

58. Defendant Hollifield then used the ski to run circles around the young cousin, splashing him several times, using a maneuver which defendant Hollifield claims he had performed many times before and felt comfortable completing.

59. After terrifying the young child, defendant Hollifield returned him to the shore, near defendant Stevens' campsite.

60. At this juncture, defendant Stevens made no attempt to intervene to curtail the dangerous horseplay.

61. Shortly after 1:15 PM on May 25, 2002, Seth and Kim decided to attempt to go swimming - after the swimmers had been splashed and defendant Hollifield had left the immediate area.

62. Seth and Kim walked around their cove, to the campsite of aunt Ginger Stevens, #51; there they borrowed aunt Ginger's pink raft; from there, they walked down to the water directly in front of aunt Ginger's campsite; it was around 1:25 PM.

63. As defendant Hollifield delivered the young cousin back to shore over in defendant Stevens' cove, 14 year old defendant Z.S. was waiting for a turn on defendant Stevens' Jet Ski.

64. Defendant Hollifield removed his Personal Floatation Device (life vest) and gave it to defendant Z.S.

65. Instead of walking back to his campsite, #47, which was in the same cove Seth and Kim had set up their camp site, defendant Hollifield asked the young and inexperienced defendant Z.S. to take him back/around on defendant Stevens' Jet Ski.

66. Upon information and belief, defendant Z.S. did not plan to engage in any mischievous behavior as he set out to return defendant Hollifield back to the cove that hosted his campsite.

67. As defendants Z.S. and Hollifield left defendant Stevens' cove, defendant Z.S. had no knowledge that Seth and Kim had entered the water on a pink raft.

68. There was no discussion beforehand about going into the next cove and splashing anyone, and young defendant Z.S. had an experienced adult passenger sitting on the rear of defendant Stevens' Jet Ski.

69. Defendant Z.S., with defendant Hollifield standing on the back without a life vest, left defendant Stevens' cove's shoreline from near defendant Stevens' campsite, at approximately 1:50 PM on May 25, 2002, at or near full speed.

70. With defendant Z.S. seated at the controls, they left defendant Stevens' cove, making a large left-hand arc destined for the adjacent cove where defendant Hollifield's camp site was located.

71. As defendant Z.S. piloted the Jet Ski around the peninsula which separated the coves, the young and inexperienced defendant Z.S. saw rafters on the pink raft.

72. The raft was located close to the right side of the cove from defendant Z.S.'s perspective.

73. The raft was oriented such that with Seth lying on his back looking up, his head rested on the raft's pillow, which was pointed away from where Kim and Seth had entered the water near Ginger's camp site, toward the peninsula of land that separated their cove from the cove where defendant Stevens had set up camp; Seth's arms were extended on the raft's armrests and his legs were dangling off the "seaward" side of the raft; Kim was lying face down with her legs dangling off the stern of the raft for propulsion.

74. For a moment, with the original sweeping left turn still employed, defendant Z.S. considered attempting one of the stunts he had, minutes before, observed defendant Hollifield execute, using the PWC to splash the people on the raft.

75. Upon information and belief, defendant Z.S. realized that the rafters were too close to the right side of the cove's shoreline, and he quickly dismissed the notion.

76. With the sweeping left arc turn still employed, defendant Z.S. released the Kawasaki's throttle while the PWC was running at approximately 20 to 30 MPH; they had just passed the mouth/entrance to defendant Hollifield and Seth and Kim's cove.

77. At these speeds, defendants Z.S. and Hollifield were covering 30 to 45 feet per second, which allowed for 2 - 3 seconds before the Jet Ski would collide with Seth and Kim.

78. According to the Kawasaki defendants' marketing materials, "releasing the throttle completely reduces the ability to steer;" thus, absent positive propulsion jetting out the rear of the Kawasaki defendants' Jet Ski, no amount of twisting or turning of the Jet Ski's handlebars could hope to produce steerage/maneuverability, which is quite separate and distinct from navigation.

79. Retarding the throttle caused the Jet Ski to immediately break out of the left-hand arc and begin a straight glide, much the way a stone departs the circular rotation of an overhead throw once it is released.

80. Defendant Z.S. realized that the straight-line course the ski had unexpectedly embarked on aimed the Jet Ski directly at Seth and Kim floating on the pink raft.

81. Accordingly, defendant Z.S. turned the handle bars hard left, in a futile attempt to re-engage the left turn.

82. As designed and manufactured by the Kawasaki defendants, without positive propulsion, despite slowing down, the ski could not and did not turn.

83. Panicking, defendant Z.S. threw the steering controls in the opposite direction hoping desperately to pass Seth and Kim to the right; the craft continued to skim across the surface of the cove toward Seth and Kim.

84. In the moment that defendant Z.S. had reversed the controls hoping to turn right, it dawned on him that the ski needed positive propulsion to steer away from what was increasingly appearing to be a dead-on crash, and suddenly defendant Z.S. remembered the counterintuitive requirement of power in order to effect steering; however, increasing the throttle with the controls turned as they were at that moment the solution dawned on defendant Z.S. would power the Jet Ski into the right bank of the cove.

85. When the Jet Ski was a distance of approximately 50 feet, Kim had observed defendant Z.S. attempt to initiate the continuation of the left hand turn but heard no noise to signify acceleration or positive propulsion.

86. As defendant Z.S. "turned," Kim ducked.

87. Without power, the Jet Ski did not respond when defendant Z.S. turned the handles to the left as Kim had witnessed.

88. Unfortunately, by the time defendant Z.S. managed to recall the counterintuitive intricacies of steering the Kawasaki defendants' Jet Ski, the Jet Ski's distance to the raft had dwindled to the length of the PWC. With the handles ultimately returned to effect a hard left turn and

power frantically reapplied, the Jet Ski's stern initially dug down as power was initiated, but then, due to the hard over turn, squirted out hard to the right in a counter-clockwise rotation.

89. Defendants' Jet Ski essentially spun left 180 degrees with the stern flying toward and through the head of the raft, where it struck Seth in his head.

90. In that same instant, defendant Hollifield was thrown off the ski to the right, landing him near the overturned raft.

91. Defendant Z.S. fell victim to the 'Fatal Flaw' that was both known and persistently designed into manufacturing of PWCs: skis manufactured during the past several decades such as the 1998 900 STX cannot be steered without positive propulsion, which actually requires increasing power in the face of an obstacle or trouble.

92. Instead, the Kawasaki defendants' 1998 900 STX was designed to glide forward in a straight line until it lost momentum, settled in the water, and eventually stopped.

93. In this instance, that glide, though initiated at 50 feet or more from the pink raft on which Seth and Kim floated, took defendants Z.S. and Hollifield precariously close to Seth and Kim, such that when defendant Z.S. turned the steering controls yet again, this time in conjunction with re-engaging power and positive propulsion, in a last ditch effort to avoid a collision, the stern of defendants' Jet Ski shot around abruptly in a counter-clockwise arc.

94. The Jet Ski struck Seth on the side of the head with sufficient force to render him unconscious, despite the chilly water temperature, and plunge the pillow end of the raft underwater, tossing Kim off the raft as well.

95. Based on the bruising injuries to Kim's left arm and upper left shoulder, the rear end of defendants' PWC rotated far enough and hit hard enough as it squirted out, up, and counter-clockwise to push Seth's head down, passing just over his face, landing on Kim's left arm and shoulder under which she had ducked upon seeing the Jet Ski approaching.

96. Following the sudden burst of energy and the surprising reaction, defendant Z.S. released the throttle immediately.

97. Defendants' Jet Ski had rotated 180 degrees, stopped, and sunk back down into the water.

98. As defendant Hollifield surfaced, he observed Kim come up struggling.

99. Defendant Hollifield grabbed Kim's arm and assisted her.

100. As a consequence of the confusion immediately following the collision, no one realized that Seth had not immediately surfaced.

101. Instead, unconscious, Seth drifted helplessly toward the bottom.

102. When Seth did not surface, defendant Z.S. removed his life vest and dove into the water.

103. As people began attempting to rescue Seth, he slipped off the edge of the lake bottom, into still deeper water where he remained for more than 20 minutes before brave friends managed to retrieve and then resuscitate him.

104. At the time of the accident, the raft had been only a few feet from shore, in approximately 8 feet of water. However, the sloping bottom of the lake in the area where the accident had occurred allowed Seth's unconscious body to quickly slip deeper into the cove.

105. A shore-line witness, Nathan Morgan, a friend of defendant Hollifield's father, found Seth's body in water approximately 15 feet deep. The air temperature was eighty four degrees, but the water temperature was sixty four degrees.

106. Many campers tried to assist as soon as they realized there had been an accident.

107. Defendant Z.S. was heard repeatedly saying, "I was driving. I hit Seth. It wouldn't turn, it wouldn't turn. It just wouldn't turn."

108. Shortly after he was recovered, Seth was taken to Hart County Hospital, then airlifted to Greenville, South Carolina's Memorial Hospital; medical care givers were able to sustain Seth's pulse and blood pressure for 33 hours before his injuries killed him at 10 PM on May 26, 2002.

109. Defendants are jointly and severally liable for Seth Ellis Folsom's injuries and wrongful death, and for damages therefrom.

110. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

111. The Kawasaki defendants are liable for punitive damages due to their willful misconduct, wantonness, and/or entire want of care which raises the presumption of conscious indifference to consequences.

112. Seth Ellis Folsom's death was the tumultuous calamity of defendants' actions and inactions.

### First Claim for Relief – Defective Product

113. Each of the foregoing allegations are re-alleged and incorporated here by reference as if stated here in its entirety.

114. At all times relevant hereto, the Kawasaki defendants were engaged in the design, manufacture, marketing, and sales of Jet Skis.

115. Kawasaki's marketing strategies were geared to the young thrill seeker and emphasized usage in close proximity to other vessels by providing brochures that illustrated the same.

116. Whether by the obvious results of their marketing strategies or the statistical claims that mounted, it was abundantly clear and foreseeable to the Kawasaki defendants that their products would be used by young and inexperienced operators.

117. The aforesaid designing, manufacturing, marketing, and sales by the Kawasaki defendants was, at all times relevant hereto, performed with the express knowledge and objective that their Jet Skis would be placed into the stream of commerce and utilized by drivers of varied ages and experience levels on public as well as private water ways.

118. The Kawasaki defendants manufactured and marketed the 1998 Kawasaki 900 STX model Jet Ski, VIN KAW04271H798, bearing hull numbers GA 0653 AZ which was registered to defendant Stevens as of May 25, 2002.

119. Plaintiffs are informed, believe, and therefore allege that prior to May 25, 2002, despite hundreds of previous incidents of off-throttle injuries and deaths, the Kawasaki defendants never called for or made any modifications to the 1998 900 STX Jet Skis since their production and delivery.

120. Long before May 25, 2002, National Transportation Safety Board (NTSB) investigations and Coast Guard complaints had put the Kawasaki defendants on notice of their defective design.

121. Correction for the off-throttle defect was developed as early as 1990 and would have cost less than $10.00 per vessel, but the Kawasaki defendants refused to incorporate it in its 1998 Jet Skis, despite knowing full well the risks and dangers created without the simple fix.

122. At all times relevant hereto, the Kawasaki defendants made a conscious decision to expose consumers to the unnecessary hazard of their vessels for the purpose of maximizing sales, notwithstanding full understanding of the unintentional, although foreseeable, mistake their design continued to foster.

123. At the time that the Kawasaki defendants manufactured, sold, and released the 1998 900 STX into service, and at all times relevant hereto, said Jet Ski was defective in that, counter to virtually all other mechanical devices available to the public and despite repeated governmental reports of investigation urging modification, this Jet Ski, like all other Jet Skis manufactured by the Kawasaki defendants, was uncontrollable without positive propulsion, notwithstanding the fact that positive propulsion would, at least momentarily, increase speed toward a hazard.

124. At all times relevant hereto, the Kawasaki defendants possessed both the technology and manufacturing capability to understand and correct this tragic defect which would monitor the driver's steering inputs as well as the speed of travel and automatically increase the engine speed to provide adequate thrust to effect steerage at the travel speed.

125. The defective condition of the Jet Ski was a direct and proximate cause of the injuries and death inflicted upon Seth Ellis Folsom and hundreds of others similarly fated.

126. The Kawasaki defendants negligently tested, designed, constructed, and inspected their Jet Skis over a period of decades.

127. The Kawasaki defendants recklessly refused to equip their Jet Skis with means of steerage with reduced power settings which would have prevented the collision which caused the injury and death of Seth Folsom.

128. The Kawasaki defendants failed to exercise reasonable care to prevent repeated injuries by users and innocent third parties of their Jet Skis, including Seth Ellis Folsom.

129. The Kawasaki defendants failed to exercise reasonable care in the design and manufacture of the 1998 900 STX while knowing and understanding the defect and the dangers associated therewith.

130. The Kawasaki defendants failed to design a means by which the Jet Ski would monitor a driver's steering inputs as well as the Jet Ski's speed of travel and automatically increase the engine speed to provide adequate thrust thereby effecting steerage at the Jet Ski's travel speed.

131. The Kawasaki defendants failed to manufacture a device by which the Jet Ski could monitor a driver's steering inputs as well as the Jet Ski's speed of travel and automatically increase the engine speed to provide adequate thrust thereby effecting steerage at the Jet Ski's travel speed.

132. The Kawasaki defendants failed to install a device or system by which the Jet Ski could monitor a driver's steering inputs as well as the Jet Ski's speed of travel and automatically increase the engine speed to provide adequate thrust thereby effecting steerage at the Jet Ski's travel speed.

133. The Kawasaki defendants negligently and recklessly refused to issue a recall to modify the 1998 900 STX in order to install the technology it possessed which would have monitored a driver's steering inputs as well as the Jet Ski's speed of travel and automatically increase the engine speed to provide adequate thrust thereby effecting steerage at the Jet Ski's travel speed.

134. The Kawasaki defendants failed to install a practical warning of the inability to steer without positive propulsion that would be immediately available to an unsuspecting or inexperienced driver, failed to provide a system to alert an operator of the need to increase power during attempted off-throttle steering, and failed to warn sufficiently of the dangers Jet Ski operation by younger persons.

135. As a direct and foreseeable result of the Kawasaki defendants' defective design and production, failure to warn, failure to remedy, and negligence, which transformed to willful

and wanton conduct after years of governmental urging for corrective action, Plaintiffs are entitled to compensatory and punitive damages.

136. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

137. Plaintiffs are entitled to punitive damages due to the Kawasaki defendants' willful misconduct, wantonness, and/or that entire want of care which raises the presumption of conscious indifference to consequences.

### Second Claim for Relief – Negligence *Per Se*

138. Each of the foregoing allegations are re-alleged and incorporated here by reference as if stated here in its entirety.

139. 46 U.S.C. § 4307 prohibits any person from manufacturing, selling, or importing into the United States any recreational vessel or any associated component which contains a defect that has been identified in any communication from the Secretary over the United States Coast Guard or the manufacturer of the vessel if the defect creates a substantial risk of personal injury to the public.

140. The Kawasaki defendants violated 46 U.S.C. § 4307, which constitutes negligence *per se.*

141. Decades of injuries and deaths placed the Kawasaki defendants on notice.

142. NTSB investigations and their reports formally put the Kawasaki defendants on notice.

143. Underwriters Laboratories and American Boating and Yacht Council conferences confirm that the installation of rudders, tabs, or brakes, which have been available since the 1980s, is feasible to effect control.

144. Had the Kawasaki defendants employed long-available technology in its 1998 production models or recalled their defective models, Seth Ellis Folsom would not have died.

145. As a direct, foreseeable, and proximate result of the Kawasaki defendants' negligence *per se* which transformed to willful and wanton conduct after years of governmental urging for corrective action, Plaintiffs are entitled to compensatory and punitive damages.

146. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

147. Plaintiffs are entitled to punitive damages due to the Kawasaki defendants' willful misconduct, wantonness, and/or that entire want of care which raises the presumption of conscious indifference to consequences.

### Third Claim for Relief – Negligence of Joe Hollifield

148. Each of the foregoing allegations are re-alleged and incorporated here by reference as if stated here in its entirety.

149. Defendant Hollifield set a dangerous example of Jet Ski operation.

150. Defendant Hollifield failed to monitor the operation of the Jet Ski.

151. Defendant Hollifield failed to ensure that training was provided before he turned the ski over.

152. Defendant Hollifield failed to provide adequate supervision for an inexperienced operator.

153. Defendant Hollifield failed to take corrective actions to promulgate safe operation of the Jet Ski.

154. As a direct and foreseeable result of defendant Hollifield's negligence, Plaintiffs are entitled to compensatory damages for the resulting injury and death to Seth Folsom.

155. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

### Fourth Claim for Relief – Negligent Entrustment

156. Each of the foregoing allegations are re-alleged and incorporated here by reference as if stated here in its entirety.

157. Defendant Stevens was negligent in his entrustment of the Jet Ski to defendant Hollifield and/or defendant Z.S.

158. As a direct and foreseeable result of defendant Stevens' negligence, Plaintiffs are entitled to compensatory damages for the resulting injury and death to Seth Folsom.

159. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

### Fifth Claim for Relief – Simple Negligence

160. Each of the foregoing allegations are re-alleged and incorporated here by reference as if stated here in its entirety.

161. Defendant Z.S. negligently failed to understand the mechanical peculiarities of the Jet Ski before operating the same.

162. Defendant Z.S. negligently drove the Jet Ski too close to others vessels or swimmers.

163. Defendant Z.S. negligently failed to keep the Jet Ski under proper control and at a safe speed under the circumstances.

164. As a direct and foreseeable result of defendant Z.S.'s negligence, Plaintiffs are entitled to compensatory damages for the resulting injury and death to Seth Folsom.

165. Plaintiffs are entitled to compensatory damages including the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses.

## Prayer

WHEREFORE, Plaintiffs pray to the Court for the following relief:

    a. that, unless waived, service be made upon the defendants;

    b. that they have and recover judgments awarding compensatory damages against and from defendants, jointly and severally, for the full value of the life of Seth Folsom; his pain and suffering before death, if any; medical expenses; and funeral and burial expenses;

    c. that they have and recover punitive damages from and against the Kawasaki defendants for their willful misconduct, wantonness, and/or entire want of care which raises the presumption of conscious indifference to consequences;

    d. that all issues of fact in this matter be tried by jury; and

    e. for such other and further relief as the Court may deem proper for Plaintiffs.

Respectfully submitted, this, the 21st day of May, 2004.

[signatures on following page]

COOK, NOELL, TOLLEY, BATES & MICHAEL, LLP

_____
J. Vincent Cook
Georgia Bar No. 184100
R. Christopher Irwin, III
Georgia Bar No. 384805

P.O. Box 1927
Athens, GA 30606
(706)549-6111

LAW OFFICES OF FRANK A. CASSIANO, JR.

_____ by RCI
Frank A. Cassiano, Jr.
North Carolina Bar No. 15798
Lead Counsel for Plaintiffs
(By R. Christopher Irwin, III, with express permission and subject to admission *pro hac vice*, for which application is being made)

P.O. Box 7383
Greenville, NC 27835-7383
(252)752-1000