IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

RICHARD K. FOLSOM and JAN L.          *
FOLSOM, individually and as
co-administrators of the estate       *
of SETH ELLIS FOLSOM, deceased
                                      *
          Plaintiffs,
                                      *
vs.
                                      *        CASE NO. 3:04-CV-42(CDL)
KAWASAKI MOTORS CORP. U.S.A.;
KAWASAKI HEAVY INDUSTRIES, LTD.;      *
KAWASAKI MOTORS MANUFACTURING
CORP., U.S.A.; JOE HOLLIFIELD;        *
BRADY A. STEVENS; and Z.S.,
a minor                               *

          Defendants.                 *


O R D E R

As a result of a tragic Jet Ski accident, Plaintiffs filed this

lawsuit in which they allege product liability claims against the

manufacturer of the Jet Ski, Kawasaki.[1]  Kawasaki filed two motions

for summary judgment, contending that federal law preempts all of

Plaintiffs' claims and, in the alternative, that it is entitled to

judgment as a matter of law under applicable state law.  Kawasaki

also filed a motion seeking to exclude the testimony of Plaintiffs'

proposed experts.[2]  For the following reasons, Kawasaki's motion for

---

[1]Plaintiffs have named three Kawasaki related entities as Defendants.
They will be referred to collectively in this Order as Kawasaki.

[2]Kawasaki also filed a Motion to Strike (Doc. 86) certain of
Plaintiffs' affidavits, arguing that portions of these affidavits
constitute inadmissible hearsay.  Since the Court did not rely on any
inadmissible evidence in ruling on Kawasaki's other motions, this motion
is denied as moot.

summary judgment is granted as to Plaintiffs' design defect, negligence per se, and punitive damages claims. The Court also grants Kawasaki's motion to exclude Plaintiffs' experts. With respect to Plaintiffs' failure to warn claim, however, the Court denies summary judgment.

FACTUAL BACKGROUND

## I. Plaintiffs' Claims

This lawsuit arises from an accident involving a 1998 Kawasaki 900STX Jet Ski personal watercraft ("the Jet Ski"). The accident resulted in the drowning death of Seth Ellis Folsom, who was floating on a raft in Lake Hartwell when Defendant Z.S., driving the Jet Ski, temporarily lost control of the steering mechanism and struck Seth on the head with the rear of the vessel. Plaintiffs Richard and Jan Folsom, Seth's parents, filed this lawsuit to recover for his death. Although Plaintiffs assert various tort claims against the individuals involved with the accident, each of the motions presently pending relate exclusively to the product claims against Kawasaki, the Jet Ski manufacturer. Plaintiffs allege that Kawasaki is liable for: (1) defective product design for failing to provide off-throttle steering capabilities; (2) failure to provide adequate warnings of the complications associated with off-throttle steering loss; and (3) negligence *per se*. Plaintiffs also seek punitive damages. Subject matter jurisdiction is based upon diversity of citizenship. *See* 28 U.S.C. § 1332.

## II.  Personal Watercraft and Off-Throttle Steering

The allegedly defective product is a 1998 Kawasaki 900STX Jet Ski personal watercraft vessel.  Personal watercraft ("PWC"), like the Kawasaki Jet Ski, are small recreational boating vessels powered by an inboard motor.  Although PWC are classified as motorboats, they differ from more traditional vessels in that "[a] PWC uses a moveable nozzle connected to a jet pump, rather than a propeller, to [create] power[.]"  (Pls.' Resp. Br. Opp. Defs.' Mot. Summ. J. Generally, and Mot. Summ. J. on Claims of Failure to Warn, Negligence *Per Se* and Punitive Damages Ex. B-1 at 9) [hereinafter "NTSB Safety Study"].  To operate a PWC, the driver must engage the throttle to push water through the jet pump.  In most models, "[t]urning the PWC handlebars changes the angle of the water exiting the jet pump" and allows the operator to maneuver the vessel.  (*Id.*)

PWC maneuverability is completely dependant upon application of the throttle.  This unique design feature creates what is known as "off-throttle steering," which is a trade term used to describe

> the situation that exists when an operator releases the throttle and then attempts to execute a turn.  The term is an oxymoron because there is little or no steering capability when the throttle is off. . . . [W]ithout power to the jet pump, there is little or no directional thrust. . . . [C]losing off the throttle leaves the vessel coasting in the original direction based on the effects of momentum, and without throttle there is very limited steering control.  [PWC] have no braking mechanism; they coast to a stop and, while coasting, there is no turning ability.

(*Id.*) Consequently, in order to maintain maneuverability in a potential collision, the operator must continue to apply the throttle even though it "may feel like speeding toward a hazard." (*Id.*) Since the "typical response based on experience with other motor vehicles is to first let off the throttle and then attempt to steer away from the hazard[,]" PWC can be hazardous in the hands of those who are unfamiliar with the distinctive operating and handling characteristics of these vessels. (*Id.*)

### III. Kawasaki's Warnings Regarding Off-Throttle Steering

Kawasaki provides warnings to the owners and operators of its Jet Skis about the potential dangers associated with off-throttle steering. For the 900STX model, Kawasaki affixes a warning label to the right side of the front hull, forward of the handlebars, just below knee height. The word "WARNING" appears at the top of the sticker, with the following statements appearing approximately halfway down: "**Releasing the throttle completely reduces the ability to steer**. This can cause you to hit an object you are trying to avoid. You must have thrust to turn." This same warning also appears on the first page of the Kawasaki Jet Ski Owner's Manual, which directs owner's and operators to "**READ THIS FIRST!**" The manual further advises that

> [t]he JET SKI watercraft is not a toy[.] . . . Underage operators may be hazardous to themselves and others. You must know and observe your state's minimum boating age regulations. Kawasaki does not recommend operation of this watercraft by persons under the age required for a driver's license.

4

> Don't forget to watch out for other boats, swimmers, or
> obstructions in your path. This is especially critical
> during a beginner's first exciting ride.

Kawasaki also includes the express recommendation that all Jet Ski owners "BECOME THOROUGHLY FAMILIAR WITH PROPER OPERATING PROCEDURES" and "[m]ake sure anyone who operates [the] watercraft is fully acquainted with the proper operating procedures."

## IV. The Accident

The accident giving rise to the present litigation involved an inexperienced Jet Ski operator who was unfamiliar with off-throttle steering. On the afternoon of May 25, 2002, the deceased, Seth Folsom, and his girlfriend, Kim Schaffert, were floating on a raft off the Georgia shore of Lake Hartwell. They were spending the Memorial Day holiday with Kim's family, who occupied multiple campsites along the lake's shoreline. A few minutes after she and Seth entered the water, Kim noticed a Jet Ski turn into the cove and head toward them. She immediately recognized the driver as her fourteen-year-old cousin, Defendant Z.S. Another of Kim's cousins, Defendant Hollifield, was riding on the back of the Jet Ski.

Various members of the family recall seeing Defendant Hollifield use the Jet Ski to splash people swimming in the lake on the morning of the accident. (*See* M. Schaffert Dep. 8:23-9:14, Jan. 28, 2005; K. Schaffert Dep. 26:6-28:16, Jan. 28, 2005; Z.S. Dep. 47:10-21.) One of the witnesses described this maneuver as coming up "from the side" and sharply turning the vessel so that "[t]here was just like

waves and a little water splashed." (M. Schaffert Dep. 12:16, 13:2-3.) The Jet Ski belonged to Defendant Stevens, who was staying at a campsite on the shore of an adjacent cove. At the end of his ride, Defendant Hollifield met Defendant Z.S. at Defendant Stevens's campsite to turn over the Jet Ski. Defendant Z.S. agreed to transport Defendant Hollifield back to his campsite, which was near where Seth and Kim lounged in the water. When Defendant Z.S. entered the cove in which Seth and Kim lounged, Kim "remember[s] [] mentioning to Seth that [he] might be coming to splash us." (K. Schaffert Dep. 44:25-45:2.) Although he admits to having briefly entertained the idea of "using the [J]et [S]ki to splash [them,]" Defendant Z.S. maintains that he "did[ not] act on the thought by changing the direction [he was] heading or accelerating or anything like that."[3] (Z.S. Dep. 119:1-2, 121:7-9.) He also maintains that he did not see Defendant Hollifield perform this maneuver earlier in the day.

Defendant Z.S. drove the Jet Ski at nearly full speed as he rounded the peninsula between the two inlets. He released the throttle, intending to continue his arcing, left-hand turn and coast in to shore. Once he released the throttle, however, the Jet Ski

---

[3]Kawasaki disputes that Defendant Z.S. ever "dismissed" the idea of splashing the couple. Instead, Kawasaki argues that Seth's death is the result of Defendant Z.S.'s reckless attempt to execute a maneuver that he lacked either the knowledge or experience to perform. In support of this position, defense experts postulate that Defendant Z.S.'s version of the events leading up to the accident could not have occurred unless he initially was heading directly toward the raft.

broke the turn and continued to glide in a straight line directly toward Seth and Kim. In a panic, Defendant Z.S. turned the handlebars left, then right, then left again, but he was unable to change the direction of the Jet Ski. The moment before impact, in a last ditch effort to avoid the collision, Defendant Z.S. jerked the handlebars hard to the left and reapplied full throttle. Defendant Hollifield was thrown from the vessel, Kim was knocked off the raft, and "the tail end [of the Jet Ski] whipped around and hit [Seth] in the head." (*Id.* at 99:9-10.) The blow rendered Seth unconscious, and he quickly sank to the bottom of the lake. Kim began to scream when she realized that he had not emerged from the water. Defendant Z.S. went into the woods, crying and throwing up, continuously repeating that "it wouldn't turn, it wouldn't turn, it wouldn't turn." (Debra Smith Depo. 18:16-17, Jan. 27, 2005.) Although Seth was recovered from the lake and temporarily revived, he never regained consciousness and ultimately died as a result of his injuries.

All parties acknowledge that Defendant Z.S. was a novice Jet Ski operator. He testified that he had "probably [] actually ridden [a Jet Ski] three or four times" for a total of approximately two hours. (*See* Z.S. Depo. 20:20-22, 55:11-18.) He claims that he never received any "formal instruction on how to operate [the Jet Ski,]" and he never "read any literature, either a handbook or operator's manual or any kind of literature at all about how to safely operate

a [PWC.]" (*Id.* at 26:12-13, 26:7-10.) Defendant Z.S. also testified that "none of [the] adults ever told [him] anything about having to use the throttle to . . . engage full steering[.]" (*Id.* at 97:10-12.)

Plaintiffs now seek to recover from each of the parties they allege contributed to the accident.[4] Defendants Hollifield and Stevens failed to answer Plaintiffs' Complaint and are in default, and Defendant Z.S. is not a party to the presently pending motions. In their claims against Kawasaki, Plaintiffs allege that the design feature of off-throttle steering caused the death of their son, Seth. They contend that the Jet Ski is a defective product because operators lose the ability to control the vessel once the throttle is released, and that this feature makes the Jet Ski unreasonably dangerous. Plaintiffs also allege that Kawasaki was aware of available technology to correct off-throttle steering loss at the time it manufactured the 1998 900STX Jet Ski. They maintain that Kawasaki negligently failed to correct this design flaw and breached its duty to provide users with adequate warnings about this unique design feature. Finally, Plaintiffs assert that punitive damages are warranted in this case. Kawasaki moves for summary judgment on each of these claims.

---

[4]In addition to their claims against Kawasaki, Plaintiffs assert a claim of simple negligence against Defendant Z.S. They also allege that Defendant Stevens, as the owner of the Jet Ski, is liable for negligent entrustment. Finally, Plaintiffs contend that Defendant Hollifield is liable for failing to supervise Defendant Z.S.'s operation of the Jet Ski.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This may be accomplished by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). There is a genuine issue if the combined body of evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

DISCUSSION

## I. Product Defect Claim

In support of their state law cause of action against Kawasaki for defective product design, Plaintiffs contend that the 1998 Kawasaki 900STX Jet Ski is defective because it is "uncontrollable without positive propulsion, notwithstanding the fact that positive propulsion would, at least momentarily, increase speed toward a hazard." (Compl. ¶ 123.) Two of Kawasaki's presently pending motions address this claim. First, Kawasaki contends that it is entitled to summary judgment because the defective product claim is preempted by the Federal Boat Safety Act of 1971, 46 U.S.C. §§ 4301-4311 ("FBSA" or "the Act"). Second, Kawasaki argues that Plaintiffs' claim must fail because the testimony of Plaintiffs' proposed experts should be excluded under *Daubert* principles, and without that testimony, no evidence exists that the Jet Ski is defective.

### A. Federal Preemption

Kawasaki first argues that the FBSA, along with the safety regulations promulgated under the Act, preempt Plaintiffs' defective product claim. Federal preemption refers to Congress's power, derived from the Supremacy Clause of the United States Constitution, to promulgate laws that are "the supreme Law of the Land[.]" U.S. Const., art. VI, cl. 2. The Supreme Court has recognized that preemption occurs (1) "when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law," (2) "when there is

outright or actual conflict between federal and state law," (3) "where compliance with both federal and state law is in effect physically impossible," (4) "where there is implicit in federal law a barrier to state regulation," (5) "where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law," and (6) "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368-69 (1986) (internal citations omitted). Additionally, "[preemption] may result not only from action taken by Congress itself; a federal agency within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369 (Internal citations omitted). Here, Kawasaki argues that Plaintiffs' product defect claim is both expressly and impliedly preempted by the FBSA.

> *1. The FBSA and Regulation of Personal Watercraft*

The FBSA "is the most recent and most comprehensive" federal enactment intended to "improve the safe operation of recreational boats" on waters of the United States. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 56 (2002). The FBSA applies to all "recreational vessels and associated equipment[,]" and permits the Secretary of Transportation to "establish[] minimal safety standards" for such vessels and equipment. *See* 46 U.S.C. §§ 4301(a), 4302(a)(1). The Secretary has delegated its regulatory authority to

the United States Coast Guard ("USCG"), 49 C.F.R. § 1.46(n)(1), which it authorized to promulgate boating regulations subject to the statutory requirements that it consider certain factors and consult with a National Boating Safety Advisory Council ("BSAC").[5]  *See* 46 U.S.C. § 4302(c).

The USCG also is permitted to issue regulation exemptions if it determines that "recreational vessel safety will not be adversely affected[.]"  *Id.* at § 4305.  At the time Congress enacted the FBSA, smaller watercraft, like PWC, composed a very small percentage of the overall boating population.  For this reason, the USCG designed its regulations to address safety issues common to larger, more conventional boats.  The smaller craft were exempted from specific regulation as long as the overall design of those craft provided an equivalent level of safety as was contemplated by the regulations. In the late-1980s, however, industry-wide PWC sales began to increase dramatically, and in 1988, "20/20" aired a television special about the increased number of PWC boating accidents.  In August 1988, Congressman Doug Barnard, Jr., Chairman of a congressional oversight committee, wrote a letter to the USCG expressing concern about the apparent lack of PWC regulation.  USCG Vice Admiral Paul A. Yost

---

[5]Congress expressly limits Advisory Council membership to those "whom the Secretary considers to have a particular expertise, knowledge, and experience in recreational boating safety."  46 U.S.C. § 13110(a).  The Advisory Council is comprised of seven representatives from each of three industry groups: (1) "State officials responsible for State boating safety programs;" (2) "recreational vessel manufacturers and associated equipment manufacturers;" and (3) "national recreational boating organizations and [] the general public[.]" *Id.* at § 13110(b)(1).

responded to this letter, assuring that "no data [] indicate[d] personal watercraft are any more dangerous to operate than most other small powerboats[,]" and that "[i]f [the Coast Guard] find[s] this is not the case . . . , [it] will focus more effort on these watercraft." (Defs.' Mot. Summ. J. Based on Federal Preemption Ex. 3 at 2, Aug. 19, 1988.)

In December 1988, the USCG issued a request to BSAC to conduct a study of PWC, specifically whether there was a need for special design regulations for this type of craft. The final report, which BSAC issued in 1989, concluded that the increase in PWC accidents was not a result of poor design, but was due to the increased sales of PWC. In April 1990, Admiral Yost again communicated to Congressman Barnard that:

> An accident analysis done as part of the [BSAC] report indicates that the majority of personal watercraft accidents are collisions with other boats. In reading the accident reports, we could find no evidence or suggestion of deceptive handling or directional instability . . . . Rather, the collisions appeared to be the result of the deliberate desire of the operators to use the maneuverability of the craft to the utmost—by riding in very close proximity to other boats, either making sudden but deliberate turns when riding in close formation with other personal watercraft, or when "wake jumping" behind other boats.

(Defs.' Mot. Summ. J. Based on Federal Preemption Ex. 9 at 1, April 9, 1990.) Admiral Yost expressed the opinion that the USCG believed that "the way to deal with the hazards associated with personal watercraft is through . . . operator restrictions[,]" not

13

"formulat[ing] a test method to evaluate the relative stability of personal watercraft[.]" (*Id.*)

The USCG continued to evaluate PWC safety, and in 1997 issued a grant to the Society of Automotive Engineers ("SAE") to study new and emerging technologies specifically related to off-throttle steering. The committee evaluated both rudder and engine control concepts to determine if either of these options was an effective solution to "provide off-throttle steering assistance in as many potential accident situations as possible, not detract from the overall handling and usability of the unit, not introduce new hazards and be acceptable from a user compatibility standpoint." (Defs.' Mot. Summ. J. Based on Federal Preemption Ex. 24 at 23.) The SAE published the results of its study, concluding that the available technology did not provide an effective solution to off-throttle steering response and that "efforts to assist operators in developing proper riding skills have the greatest potential to reduce the risk of off-throttle steering accidents."[6] (*Id.* at 28.) At approximately this same time, however, another PWC study was being conducted by the National Transportation and Safety Board ("NTSB").[7] After reviewing the data

---

[6]Specifically, the SAE determined that: (1) "[t]he current technology, fixed rudders evaluated to assist in off-throttle steering of jet pump propeller watercraft including PWC do not provide an effective off-throttle steering response and/or have an adverse effect on handling and introducing additional hazards;" and (2) although "[t]here are additional technologies such as fins, flaps, [and] scoops[, they] have not reached the prototype stage, [but] could be evaluated in the future." SAE Study at 28.

[7]The NTSB is an independent federal agency mandated by Congress to

and statistics from 1996-1997 PWC accident reports, the NTSB noted that "84 percent of [PWC] operators . . . reported receiving no boating instruction" and "[a]ccident reports . . . highlight problems of operator control during off-throttle steering situations." (*Id.* at 56.) The NTSB concluded that "[s]ome portion of operator control problems may be attributed to the operating *design* of [PWC,]" and recommended that PWC manufacturers "[e]valuate [PWC] designs and make changes to improve operator control[.]" (*Id.* at 56-7) (emphasis added). It also recommended that the USCG "[e]liminate the existing process of exempting [PWC] from standards that were defined for conventional boats and develop, with the [PWC] manufacturers, comprehensive standards that are specific to the safety risks of [PWC]." (*Id.*) The USCG chose not to follow the recommendations of the NTSB, and it did not promulgate separate regulations for PWC as a result of either study.[8]

### 2. The FBSA and Federal Preemption

Kawasaki contends that Plaintiffs' defective design claim is expressly preempted by the FBSA's preemption clause and impliedly preempted by the USCG's affirmative decision *not* to regulate PWC

---

investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. (*See* NTSB Safety Study.)

[8]In August 2002, the USCG adopted the SAE's voluntary, industry-developed off-throttle steering standard, J2608. The J2608 standard only covers craft beginning in model year 2006, but specifically indicates that PWC manufacturers must provide off-throttle steering capabilities.

design. Plaintiffs contend that Kawasaki's preemption defense conflicts with the Supreme Court's decision in *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), and that neither express nor implied preemption principles bar Plaintiffs' state law claim for defective product design.

In *Sprietsma*, the estate of a woman who was thrown from a boat and hit by the propeller sued the manufacturer under the theory that the boat was unreasonably dangerous because the motor was not protected by a propeller guard. *See id.* at 54-5. The defendant in that case argued that the FBSA preempted the claim.[9] The issue presented to the Supreme Court was "whether a state common-law tort action seeking damages from the manufacturer of an outboard motor is pre-empted either by the enactment of the [FBSA], or by the decision of the Coast Guard . . . *not* to promulgate a regulation requiring propeller guards on motorboats." *Id.* at 54 (emphasis added). The Supreme Court held that common-law tort claims are not expressly pre-empted by FBSA. *Id.* at 64. In addressing the issue of implied preemption, the *Sprietsma* Court acknowledged that "a federal decision

---

[9]The FBSA contains an express preemption clause, which states:

> Unless permitted by the Secretary . . . , a State
> . . . may not establish, continue in effect, or
> enforce a law or regulation establishing a
> recreational vessel or associated equipment
> performance or other safety standard . . . that is
> not identical to a regulation prescribed under
> section 4302 of this title.

46 U.S.C. § 4306.

16

to forgo regulation in a given area may imply an *authoritative* federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision to regulate." *Id.* at 66 (quotation marks and internal citations omitted) (first emphasis added). In the case of the FBSA, however, the Court determined that "a Coast Guard decision not to regulate a particular aspect of boating safety is fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards." *Id.* at 65. Noting that "the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered," the Court determined that the decision "reveal[ed] only a judgment that the available data did not meet the FBSA's 'stringent' criteria for federal regulation[,]" and "[did] not convey an 'authoritative' message of a federal policy *against* propeller guards." *Id.* at 66-7 (emphasis added).

In the present case, this Court likewise finds that the USCG's decision not to regulate PWC "does not convey an 'authoritative' message of a federal policy against [the regulation of off-throttle steering]" and that Kawasaki's attempt to distinguish *Sprietsma* on the basis of the Coast Guard's intent to preempt is unavailing. First, it is clear from the record that the USCG chose not to impose off-throttle steering requirements because (1) some of the problems associated with off-throttle steering loss can be addressed through operator regulations, and (2) current studies suggest that presently

17

available solutions, such as rudders, may pose additional hazards. Second, although the USCG has not formally begun to regulate PWC, it adopted the J2608 standard as the safety standard for all PWC manufactured in model year 2006 or later. Since this standard requires PWC manufacturers to provide off-throttle steering capabilities, it is clear that the USCG's "'authoritative' message" is that off-throttle steering is a problem that needs to be addressed. (*See* Defs.' Mot. Summ. J. Based on Federal Preemption Ex. 18 at 1.) Finally, despite Kawasaki's arguments to the contrary, it is not clear that "[t]he Coast Guard has consistently held that the steering designs of existing personal watercraft are not defective." (Pls.' Resp. Br. Opp. Defs.' Mot. Summ. J. Generally & Mot. Summ J. on Claims of Failure to Warn, Negligence *Per Se* & Punitive Damages Ex. A at 2, Aug. 28, 2002.) The only evidence in the record suggesting that the USCG found the off-throttle steering design non-defective is correspondence from Admiral Yost to Congressman Bernard. Nothing in the present record, however, establishes Admiral Yost's authority to speak on behalf of the USCG on this issue such that his statements could formulate an agency policy against PWC regulation. As was the case in *Sprietsma*, the USCG's decision not to regulate off-throttle steering was primarily due to a lack of available data relating to off-throttle steering solutions. Accordingly, Kawasaki's Motion for Summary Judgment based upon federal preemption is denied.

A.    Plaintiffs' Proposed Expert Testimony

Kawasaki also argues that it is entitled to summary judgment on Plaintiffs' defective design claim because Plaintiffs failed to produce admissible evidence establishing that the 1998 900STX Jet Ski was defectively designed.    In order to prevail on a claim for defective product design, a plaintiff must prove both that the product is defective and that the defect was the proximate cause of the alleged injury.    *See Jones v. Nordic Track, Inc.*, 274 Ga. 115, 117, 550 S.E.2d 101, 103 (2001); *S.K. Hand Tool Corp. v. Lowman*, 223 Ga. App. 712, 714, 479 S.E.2d 103, 106 (1996).    Here, Plaintiffs claim that the off-throttle steering design feature makes the 1998 900STX Jet Ski a defective product, and that off-throttle steering loss proximately caused the accident at issue.    Construing the facts in Plaintiffs' favor as required at this stage of the proceedings, the Court finds that the accident resulted from Defendant Z.S.'s inability to steer the Jet Ski off-throttle.    The issue for purposes of the pending summary judgment motion is whether Plaintiffs have produced sufficient evidence from which a reasonable jury could conclude that this design feature makes the Jet Ski defective.

In support of their defective product claims, Plaintiffs proffer the testimony of two proposed experts, Ronald Simner and Captain Bradley Cuthbertson.    Both Simner and Cuthbertson opine that the off-throttle steering design of the 900STX Jet Ski makes the product defective.    Kawasaki responds that the opinions of Simner and

Cuthbertson are not admissible under Federal Rule of Evidence 702 because (1) neither Simner nor Cuthbertson is qualified to give opinions on PWC design, and (2) their opinions are unreliable because their testing methods are unreliable. Kawasaki maintains that without their testimony, no evidence exists in support of Plaintiffs' allegations that the Jet Ski was defectively designed.

### 1. *Background and Conclusions of Plaintiffs' Experts*[10]

Both Simner and Cuthbertson have owned, operated and maintained PWC over a period of approximately fifteen years. Simner owns a company, Ride Technology, that specializes in rudders designed to address the issue of off-throttle steering. He holds United States patents on two types of rudders that he specifically designed for use on PWC. His first rudder design, WaveTrax, "has been evaluated by nearly all PWC manufacturers" and has been "tested under two U.S. Coast Guard grants addressing Off-Throttle Steering Loss [] in Personal Watercraft." (Simner Rule 26 Report 3, Aug. 30, 2005.) Simner also has been a member of the SAE PWC Subcommittee since 2000, and participated in the development of the J2608 standard for PWC off-throttle steering. Cuthbertson is a former professional PWC racer who has "developed safety courses for and lectured on safe [PWC] operation, and [has] worked with and consulted with a wide range of entities regarding the operation of [PWC], ranging from U.S.

---

[10]The Court held a *Daubert* hearing in conjunction with a hearing on Kawasaki's Motion for Summary Judgment. (*See* Minute Sheet, Dec. 18, 2006.)

Coast Guard, to law enforcement agencies, to manufacturers . . . , to insurance companies, and attorneys." (Cuthbertson Decl. ¶ 2, Nov. 9, 2006.)

Simner and Cuthbertson performed collision avoidance testing on a modified 1998 Kawasaki 900STX Jet Ski to determine whether Simner's WaveTrax rudder system would provide an effective method for improving off-throttle steering control. They constructed three separate test courses at Lake Havasu in Arizona. The first two courses are industry standard safety test courses that implement a twenty-two foot entry chute marked with buoys. The test rider is supposed to release the throttle upon reaching the first set of buoys, then turn the handlebars once the vessel reaches the two turn buoys at the end of the entry chute. An obstacle triangle, set forty feet from the turn buoys with the apex facing the entry chute, represents the object the rider is trying to avoid. Testing the stock Kawasaki Jet Ski on each of these courses, Cuthbertson was never able to avoid hitting the obstacle triangle. Using the Jet Ski fitted with rudders, however, he avoided hitting the triangle on every run.

Simner and Cuthbertson also designed and constructed a third course based on information they obtained from deposition testimony in this case. They assumed that (1) the Jet Ski was moving at approximately thirty miles per hour at the time Defendant Z.S. released the throttle, (2) the rider weight was approximately 355

21

pounds, and (3) the elapsed time between Defendant Z.S.'s throttle release and reapplication was approximately 3.2 seconds. Using this information, Simner and Cuthbertson performed several deceleration runs with the stock 900STX Jet Ski. They determined that a Jet Ski coasting from thirty miles per hour would travel 103.72 feet in 3.2 seconds. Although they did not actually test the stock Jet Ski on the raft collision avoidance course, they were able to conclude that a Jet Ski equipped with rudders would have avoided hitting the raft at speeds of thirty, twenty-five, and twenty miles per hour.

As a result of their testing, Simner and Cuthbertson each determined that off-throttle steering loss "was the primary cause of the accident[,]" (Simner Rule 26 Report 4 at ¶ 2; *see also* Cuthbertson Decl. ¶ 11) and that installing a modified WaveTrax rudder system greatly improves the off-throttle maneuverability of the Jet Ski. Since "the technology to overcome Off Throttle Steering Loss has been around since at least 1992[,]" (Simner Decl. ¶ 4, Nov. 9, 2006; *see also* Cuthbertson Decl. ¶ 11), they also concluded that using a rudder system was an available design alternative at the time Kawasaki designed the 1998 900STX model Jet Ski. Additionally, Simner and Cuthbertson each determined that rudder technology is a feasible design alternative because one of Kawasaki's competitors, Bombardier, Inc., uses rudders to overcome off-throttle steering loss on its Sea-Doo products. (*See* Simner Decl. ¶ 7; Cuthbertson Decl. ¶ 11.) Finally, after reviewing their test results, the witness

depositions, and available literature on design and performance standards, Simner and Cuthbertson concluded that the 1998 Kawasaki 900STX Jet Ski was defectively designed because "it deprive[s] the operator of steering control when the throttle [is] released from speeds above idle and the handlebars turned." (Simner Decl. ¶ 1; *see also* Cuthbertson Decl. ¶ 10.)  Simner also opined that "current on-product warnings, including those on the ski in question, are ineffective[]" in apprising Jet Ski operators of the potential hazards of off-throttle steering." (Simner Decl. ¶ 5.)  Kawasaki contends that none of this evidence is admissible expert testimony.

### 2.    *General Principles of Admissibility*

Federal Rules of Evidence Rule 702 governs the admissibility of expert testimony.  It provides that "a witness qualified to testify as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  In applying this rule, the trial court must act as a gatekeeper and admit expert testimony only where it is both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). "District courts are charged with this gatekeeping function to ensure that speculative, unreliable testimony does not reach the jury under

the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quotation marks and internal citation omitted). The proponent of the evidence bears the burden of showing by a preponderance of the evidence that the proffered expert testimony is admissible. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").

The language of Rule 702 imposes three specific restrictions on the admissibility of expert testimony: qualification, reliability, and assistance. First, to qualify to testify as an expert, a witness must possess specialized expertise based on knowledge, skill, experience, training, or education. *See* Fed. R. Evid. 702. Although an expert is not required to have personal knowledge of the facts at issue in the case, Fed. R. Evid. 703, he must be qualified "regarding the matters he intends to address." *Allison*, 184 F.3d at 1309. Second, "the methodology by which the expert reaches his conclusion [must be] sufficiently reliable[.]" *Id.* The proffered testimony must be "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quotation marks and internal citation omitted). The Supreme Court has provided a non-exclusive list of factors to assist

in determining whether an expert's opinion is reliable: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison*, 184 F.3d at 1312 (*citing Daubert*, 509 U.S. at 593-94). Finally, the expert testimony must "fit" the case, meaning the testimony must be relevant to the issues at hand and assist the trier of fact in resolving those issues. *See Frazier*, 387 F.3d at 1262-63. If the testimony addresses issues within the understanding and experience of an average citizen, it is properly excluded under Rule 702.

In the present action, Kawasaki contends that Plaintiffs' expert evidence fails to satisfy the first two prongs of the admissibility test–qualification and reliability. First, Kawasaki argues that Plaintiffs' experts are not qualified to testify about PWC design because they each lack sufficient knowledge, skill, experience, training, or education in this area. Second, Kawasaki asserts that the proffered opinions are unreliable because Simner's rudder system, the proposed alternative design, has not been scientifically tested and is not a feasible alternative design.

### 3. Qualifications of Plaintiffs' Experts

Kawasaki's first argument is that neither Simner nor Cuthbertson is qualified to render an opinion as a PWC design expert. With regard to Simner, Kawasaki argues that: (1) although his sole

occupation since 1996 has been to testify for plaintiffs' lawyers against the PWC industry, he has never served as a design expert; (2) he has no specific training or education in accident reconstruction or biomechanics; (3) he has no knowledge, skill, experience, training, or education in boat design or naval architecture; and (4) his PWC experience is limited to test riding and rudder design. (*See* Simner Dep. 119:7-22, 35:11-8, 36:19-25, Oct. 11, 2005.) With respect to Cuthbertson, Kawasaki argues that: (1) although he has been a professional PWC racer, he is currently employed as a tour boat operator in Hawaii; (2) he has never received a formal education in any field; and (3) he has no knowledge, skill, experience, training, or education in boat design or naval architecture. (*See* Cuthbertson Dep. 18:13-20:22, 39:24-41:14, Oct. 12, 2005.)

Plaintiffs dispute Kawasaki's assertions that Simner and Cuthbertson are not qualified to opine that off-throttle steering is a design defect in the 1998 900STX Jet Ski. Specifically, Plaintiffs respond that both Simner and Cuthbertson are qualified by the fact that, in forming their opinions, they considered (1) federal design and performance standards for PWC, (2) relevant literature, including the NTSB Report, (3) product design and accident history, (4) charts and diagrams, (5) data from scientific testing, (6) the feasibility of suggested modifications, and (7) the risk-utility of the suggested modifications. "In essence, . . . [Plaintiffs'] argument is that

26

anyone who would use the *methodology* that [Simner and Cuthbertson] used must [] be qualified[]" to render the opinion that off-throttle steering is a defective design feature of the 1998 900STX Jet Ski. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) (emphasis added) (internal quotation marks omitted). This argument clearly "ignore[s] the conceptual distinction between an expert's qualifications and the reliability of his proffered opinion." *Id.* While the reliability analysis focuses on the bases for the proposed expert's conclusions, the qualification analysis focuses on the expert's general familiarity with the field in which he proposes to testify. To the extent Plaintiffs contend that Simner and Cuthbertson have acquired superior knowledge, skill, experience, training, or education from the sources to which Plaintiffs cite, the Court is not persuaded that either witness is qualified to testify as a PWC design expert.

It is clear that both of these witnesses are highly experienced PWC riders, and therefore are more familiar with the potential hazards of off-throttle steering than the average PWC operator. Additionally, Cuthbertson has developed safety courses and lectured on the safe operation of PWC, and Simner has designed rudder systems specifically intended to address the problems with off-throttle steering. However, the fact that these witnesses are qualified to testify generally about off-throttle steering and PWC maneuverability simply does not establish that they are likewise qualified to testify

that the 1998 900STX Jet Ski "contains a product defect because it cannot be steered <u>once the throttle is released</u>," (Simner Decl. ¶ 3, Nov. 9, 2006), or that "[r]udders are a viable solution" to off-throttle steering loss. (Simner Rule 26 Report 5.) Under Georgia law, a product design is defective when "the risks inherent in [the] design [outweigh] the utility or benefit derived from the product." *Dean v. Toyota Indus. Equip. Mfg., Inc.*, 246 Ga. App. 255, 259, 540 S.E.2d 233, 237 (2000). The factors relevant to this risk-utility analysis include:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger, and the user's ability to avoid danger; the state of the art at the time the product is manufactured; the manufacturer's ability to eliminate the danger without impairing the product's usefulness or making it too expensive; and the feasibility of spreading the loss in the price or by purchasing insurance.

*Id.* The most important factor, however, "is whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware." *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 736, 450 S.E.2d 671, 674 (1994). An expert in design defects must be qualified to (1) conduct this risk-utility analysis based on knowledge, skill, experience, training, or education, and (2) provide the opinion that "the risks inherent in [the] design [outweigh] the utility or benefit derived from the product." *See Dean*, 246 Ga. App. at 259, 540 S.E.2d at 237. There

28

is no evidence that either Simner or Cuthbertson possess the knowledge, skill, experience, training, or education necessary to compare the off-throttle steering design to the rudder-equipped model and conclude that off-throttle steering makes the Jet Ski "simply so dangerous that it should not have been made available at all." *Id.* The Court finds that neither of Plaintiffs' proposed experts is qualified to provide opinion testimony in the area of PWC design. Since there is no other evidence that the 1998 900STX Jet Ski is defective, Kawasaki is entitled to summary judgment on Plaintiffs' defective product design claims.

## II. Failure to Warn Claim

In addition to their design defect claim, Plaintiffs assert a failure to warn claim based upon Kawasaki's alleged breached of its duty to adequately warn Jet Ski users of the risks associated with off-throttle steering loss. A product manufacturer may breach its duty to warn either by "failing to provide an adequate warning of the product's potential risks" or by "failing to adequately communicate the warning to the ultimate user[.]" *See Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75, 460 S.E.2d 532, 534 (1995); *Rhodes v. Interstate Battery Sys.*, 722 F.2d 1517, 1519 (11th Cir. 1984). To prevail on a failure to warn claim, the plaintiff must establish that the defendant's failure to warn proximately caused the subject injury. Here, Plaintiffs contend that Kawasaki breached its duty to warn by failing to position the onboard warning about off-throttle

steering such that a Jet Ski operator could read and understand the language of that warning.[11]  Kawasaki argues that its method of communication is adequate as a matter of law, and that even if the warning was inadequately communicated, Plaintiffs failed to produce sufficient evidence that the failure to communicate the risks of off-throttle steering proximately caused Seth Folsom's death.

A.    Adequacy of Kawasaki's Communication of Warnings

In support of their failure to warn claim, Plaintiffs rely solely upon the alleged inadequacy of the Jet Ski's onboard warning.[12] Plaintiffs argue that because the label that addresses off-throttle steering is not "immediately available to an unsuspecting or inexperienced driver," (see Compl. ¶ 134), Kawasaki breached its duty to warn Defendant Z.S. that he would lose the ability to steer the 900STX Jet Ski if he released the throttle.  Kawasaki contends that

_____

[11]Plaintiffs concede that they are barred from challenging the *substance* of the off-throttle steering warning because Defendant Z.S. did not read the warning.  Where a product user fails to read an allegedly negligent warning, the "failure to read . . . , not the warning itself, is considered the proximate cause of an injury resulting from product misuse." *Henry v. Gen. Motors Corp.*, 60 F.3d 1545, 1548 (11th Cir. 1995); *see also Wilson Foods*, 218 Ga. App. at 75, 460 S.E.2d at 534; *Camden Oil Co., LLC v. Jackson*, 270 Ga. App. 837, 840, 609 S.E.2d 356, 358-59 (Ga. App. 2004) ("[W]here a plaintiff does not read an allegedly inadequate warning, the adequacy of the warning's contents cannot be a proximate cause of the plaintiff's injuries[.]").

[12]Kawasaki also contends that adequate warnings on off-throttle steering were available in the Jet Ski Owner's Manual and the Georgia Department of Natural Resources Handbook of Georgia Boating Laws and Responsibilities.  Since Defendant Z.S. was never provided access to either of these materials, it is unnecessary for this Court to determine whether the warnings contained therein were adequately communicated. Furthermore, a state-issued warning is not relevant to the question of whether Kawasaki fulfilled its independent duty to adequately warn Jet Ski consumers about the risks associated with its product.

the placement of its warning label is adequate as a matter of law. The issue, therefore, is whether a reasonable jury could conclude from the evidence that Kawasaki's efforts to communicate the warning about off-throttle steering amount to a negligent failure to warn. *See Camden Oil*, 270 Ga. App. at 841, 609 S.E.2d at 359; *Thornton v. E.I. Du Pont de Nemours & Co.*, 22 F.3d 284, 289 (11th Cir. 1994).

Under Georgia law, "[f]ailure to communicate an adequate warning involves such questions . . . as to location and presentation of the warning." *Id.* at 840, 609 S.E.2d at 359; *Wilson Foods*, 218 Ga. App. at 75, 460 S.E.2d at 534. The courts have clearly held that "[i]t is [uniformly] a jury question whether or not the manufacturer was negligent in failing to place a warning in such position, color, and size print or to use symbols which would call the user's attention to the warning or cause the user to be more likely to read the label and warning than not." *Camden Oil*, 270 Ga. App. at 841, 609 S.E.2d at 359 (quotation marks and footnote omitted); *Wilson Foods*, 218 Ga. App. at 75, 460 S.E.2d at 534 (quotation marks and internal citation omitted); *Thornton*, 22 F.3d at 289. In the present case, Plaintiffs evidence shows that the 900STX Jet Ski has eleven onboard warning labels affixed to the body of the vessel. The sticker that addresses off-throttle steering is located on the side of the Jet Ski, in front of the handlebars, just below the driver's knee. According to one of Kawasaki's design engineers, "[t]he operator cannot see [this label] when he is seated on the saddle[.]" Tsumiyama Dep. 90:4-5,

31

Aug. 31, 2006.) Furthermore, the specific warning about off-throttle steering appears in the middle of the label, amidst nine other product warnings listed on the same sticker. Finally, although an operator "can see the warning[ sticker] when he is getting on and off the boat[,]" (*id.* at 90:5-6), Defendant Z.S. testified that he did not notice any of the stickers affixed to the Jet Ski. (Z.S. Dep. 26:1-27:1, 30:11-15.) Construing these facts in the light most favorable to Plaintiffs, a jury could reasonably determine that Kawasaki "was negligent in failing to place [the off-throttle steering] warning in such position, color, and size print or to use symbols which would call the user's attention to the warning or cause the user to be more likely to read the label and warning than not." *Camden Oil*, 270 Ga. App. at 841, 609 S.E.2d at 359 (quotation marks and footnote omitted); *Wilson Foods*, 218 Ga. App. at 75, 460 S.E.2d at 534 (quotation marks and internal citation omitted). Therefore, the Court finds that there exists a genuine issue of material fact on the question of whether the on-board warnings were sufficiently conspicuous to adequately communicate the off-throttle steering warning to Jet Ski operators. This finding, however, does not end the inquiry. To avoid summary judgment, Plaintiffs must also produce evidence from which a reasonable jury could conclude that absence of an adequate conspicuous warning proximately caused the accident that resulted in Seth Folsom's death.

B.   Inadequate Communication as the Proximate Cause

Kawasaki argues that even if a more conspicuous warning had been placed on the Jet Ski, the undisputed evidence establishes that Defendant Z.S. (1) would not have read the warning, and (2) even if he had read the warning, it would not have produced a different result.  Thus, Kawasaki contends that the alleged failure to warn was not the proximate cause of the accident.

Construing the evidence in favor of the Plaintiffs, the record establishes: (1) that the operator of the Jet Ski, Defendant Z.S., did not notice any of the warning labels affixed to the Jet Ski; (2) that he would have understood an instruction "to keep the throttle engaged to maintain steering" if that message had been adequately communicated (*See* Z.S. Dep. 97: 15-98:15); (3) that a jury could conclude that Kawasaki did not adequately communicate such message; and (4) that Defendant Z.S. could have avoided the accident if he had kept the throttle engaged while attempting to make his turn.  The Court finds that under these circumstances, genuine issues of material fact exist to be tried as to whether Kawasaki's alleged failure to warn of the off-steering characteristics of the Jet Ski proximately caused the accident in question.[13]   Accordingly,

_____

[13]The Court rejects any suggestion by Kawasaki that the operator's failure to read any of the on-board warnings warrants summary judgment on the failure to warn claim.  In fact, "where plaintiff alleges that a warning is inadequate because it is not effectively communicated —presentation and location of warnings case—the [ ] failure to read the warning may be [circumstantial] evidence of the inadequacy of the warning." *Wilson Foods,* 218 Ga. App. at 75, 460 S.E.2d at 534 (second alteration in original (internal quotations and citations omitted); *Camden*

33

Kawasaki's Motion for Summary Judgment as to Plaintiffs' failure to warn claim is denied.

### III.  Negligence *Per Se* Claim

Finally, Plaintiffs assert a negligence per se claim based upon Kawasaki's alleged violation of a provision of the FBSA that requires manufacturers to provide notice of product defects when such defects become known to the manufacturer.  Specifically, Plaintiffs contend that Kawasaki violated 46 U.S.C. § 4310,[14] which provides:

> If a recreational vessel . . . has left the place of manufacture and the [] vessel manufacturer discovers or acquires information that [it] decides, in the exercise of reasonable and prudent judgment, indicates that a [] vessel . . . subject to an applicable regulation prescribed under section 4302 of this title either fails to comply with the regulation, or contains a defect that creates a substantial risk of personal injury to the public, the manufacturer shall provide notification of the defect or failure of compliance . . . within a reasonable time after the manufacturer has discovered the defect.

46 U.S.C. § 4310(b).  Plaintiffs argue that the 1998 NTSB Safety Study provided notice to Kawasaki, and other PWC manufacturers, that

---

*Oil*, 270 Ga. App. at 840-41, 609 S.E.2d at 359.

[14]Plaintiffs' Complaint references a different provision of the FBSA as the basis for their negligence *per se* claim.  The complaint alleges that Kawasaki breached 46 U.S.C. § 4307, which states that "[a] person may not [] manufacture[] . . . a recreational vessel[] . . . unless [] it conforms with [the FBSA] or a regulation prescribed under [the FBSA,] and [] it does not contain a defect which has been identified[] in any communication to such person by the Secretary[.]"  46 U.S.C. § 4307(a)(1)(A)(i)-(ii).  To the extent Plaintiffs continue to seek relief under the theory that Kawasaki violated § 4307, rather than § 4310, the Court grants Kawasaki's Motion for Summary Judgment on the basis that Plaintiffs have not established that Kawasaki actually violated this provision.

the off-throttle steering design feature "creates a substantial risk of personal injury to the public." Plaintiffs also contend that Kawasaki breached its duty to "exercise [] reasonable and prudent judgment" when it failed to "provide notification of the defect" by either issuing a recall or sending enhanced warning stickers to Jet Ski owners. Plaintiffs maintain that this conduct by Kawasaki violates the FBSA and thus constitutes negligence per se.

Under Georgia law, a plaintiff may "adopt[] a statute as a standard of conduct so that its violation becomes negligence per se." *Rockefeller v. Kaiser Found. Health Plan of Ga.*, 251 Ga. App. 699, 702, 554 S.E.2d 623, 626 (2001). Plaintiffs cannot sustain such a claim in this case, however, because they have failed to establish that Kawasaki violated the FBSA. To establish a violation of the FBSA provision upon which Plaintiffs rely, Plaintiffs must show preliminarily that the product "contains a defect that creates a substantial risk of permanent injury to the public." As the Court has previously found, Plaintiffs failed to produce evidence from which a reasonable jury could conclude that the 1998 900STX Jet Ski contains any such defect. If the Jet Ski is not defective, Kawasaki has no duty to provide notification under the FBSA. Accordingly, Kawasaki is entitled to summary judgment on this claim.

## IV. Punitive Damages Claim

Under Georgia law, "[p]unitive damages are not available in a wrongful death action." *Roseberry v. Brooks*, 218 Ga. App. 202, 209,

461 S.E.2d 262, 268 (1995) (quotation marks and internal citations omitted); *Truelove v. Wilson*, 159 Ga. App. 906, 907, 285 S.E.2d 556, 558 (1981). Accordingly, Plaintiffs may only recover punitive damages if they can sustain a claim on behalf of their son's estate for their son's pain and suffering prior to his death. *See Velez v. Bethune*, 219 Ga. App. 679, 688, 466 S.E.2d 627, 634 (1995). Plaintiffs have now abandoned a pain and suffering claim, acknowledging that there no evidence to suggest that their son ever regained consciousness after the accident, and thus no evidence exists that he suffered conscious pain prior to his death. Since Plaintiffs' action is limited to one for wrongful death, they cannot recover punitive damages, and Kawasaki is entitled to summary judgment on this claim.

CONCLUSION

For the foregoing reasons, the Court rules as follows:

1. Kawasaki's Motion for Summary Judgment, generally, and on claims of failure to warn, negligence *per se*, and punitive damages (Doc. 44) is granted as to Plaintiffs' claims for defective product design, negligence per se, and punitive damages and denied as to Plaintiffs' claim for failure to warn;

2. Kawasaki's Motion for Summary Judgment Based on Federal Preemption (Doc. 48) is denied;

3.  Kawasaki's Motion Under *Daubert* to Exclude the Testimony of Plaintiff's Experts Simner and Cuthbertson (Doc. 57) is granted; and

4.  Kawasaki's Motion to Strike (Doc. 86) is denied.

In light of these rulings, the only claims that remain pending are Plaintiffs' failure to warn claim against Kawasaki and Plaintiffs' claims against Defendants Hollifield, Stevens, and Z.S.

IT IS SO ORDERED, this 24th day of May, 2007.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE